IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL GRANT,**<br>*Plaintiff,*<br><br>**v.**<br><br>**CITY OF PHILADELPHIA,** *et al.*<br>*Defendants.* | **CIVIL ACTION**<br><br>**NO. 20-735** |

## MEMORANDUM RE: SUMMARY JUDGMENT

Baylson, J.                                                                          October 20, 2022

This civil action arises from events that took place in Philadelphia's Love Park on December 21, 2019, during the Christmas Village, culminating in the seizure of Plaintiff Michael Grant, also known as "Philly Jesus."  Plaintiff has brought various claims under the First and Fourth Amendments against Defendants Emile Sauris and Steven Moffitt, both police officers with the Philadelphia Police Department.  Plaintiff also alleges a claim of municipal liability against Defendant City of Philadelphia.  Defendants seek summary judgment on all claims.  For the following reasons, the Motion will be granted.

## I.     Relevant Factual Background[1]

The facts of this case may remind opera fans of Mozart's The Magic Flute – when the unusually dressed bird catcher Papageno is restrained and muzzled, but soon released.

On December 21, 2019, Plaintiff appeared as "Philly Jesus" at Philadelphia's Love Park, which at the time was location of the Christmas Village.  Def.'s SUF ¶ 1; Pl.'s Resp. to Def.'s SUF

---

[1]      Unless otherwise indicated, all facts, taken in the light most favorable to Plaintiff, are derived from Defendants' Statement of Undisputed Facts (ECF 101) ("Def.'s SUF"), Plaintiff's related response and counterstatement (ECF 108) (respectively, "Pl.'s Resp. to Def.'s SUF" and "Pl.'s Counterstatement"), or Defendants' response to Plaintiff's counterstatement (ECF 111) ("Def.'s Resp. to Counterstatement"), or depositions filed of record.

¶ 1.  Plaintiff was at the Christmas Village "dressing up as [his] interpretation of Jesus and keeping the Christ in Christmas at Christmas Village like [he] did every year since 2014."  See Mot. Ex. A ("Grant Dep.") at 14:5-20.  He was there to "express[] [his] religious liberty, [his] freedom of speech, as an American citizen."  Id.

Plaintiff was positioned approximately ten (10) feet away from the LOVE sign, in the direction of City Hall, in the southeast quadrant of Love Park.  See Def.'s SUF ¶ 2; Pl.'s Resp. to Def.'s SUF ¶ 2.  Plaintiff stood in the midst of a number of Christmas Village booths containing vendors:

> Q: Where were you standing relative to the booths?  Like were there booths on your left, booths on your right? Tell me how that was set up.
> A: I was surrounded by them in like a sphere, like a circle.
> Q: Oaky [sic]. And how far were you – again you can estimate – were you from the nearest booth? How many feet?
> A: Like 7, 10 feet.

Grant Dep. 23:9-17.

See also Def.'s SUF ¶ 4; Pl.'s Resp. to Def.'s SUF ¶ 4.  The Christmas Village was "very, very busy" with "a lot of people around," including families with children.  Def.'s SUF ¶¶ 12, 37; Pl.'s Resp. to Def.'s SUF ¶¶ 12, 37.  Some of the vendors expressed concerns about Grant's behavior:

> Q: [D]id some people tell you they didn't want you there and they felt that your presence was a problem?
> A: Yeah, yeah.  They called me a troublemaker.  Yeah.
> Q: Who called you a troublemaker?  Some of the vendors?
> A: Yeah. Well, very few, and just, you know, some of the tourists that came to Christmas Village.  Some of them think: [t]here's a crazy guy here, you know?

Grant Dep. 28:3-14.  See also Def's SUF ¶¶ 7-8; Pl.'s Resp. to Def.'s SUF ¶¶ 7-8.

Plaintiff, acting alone, spoke to the crowd with an elevated voice, but was not screaming or speaking loudly. [2]  See Pl.'s Resp. to Def.'s SUF ¶¶ 3, 5; Grant Dep. 31:18-22; Plaintiff held a stick, and at his feet was a "big" sign that stated, "If you die tonight, are you going to heaven or hell?  Come up and ask me."  Def.'s SUF ¶ 39; Pl.'s Resp. to Def.'s SUF ¶ 39; Grant Dep. 18:4-18.  Plaintiff also states that he brought a collection basket with him:

> Q: [Did] you have any other items with you?
> A: Yeah. I had a basket, like a basket that was made out of like wood and straw. It had like a dollar folded on the crevice of the corner in case someone wanted to throw something in there. I wasn't out there for money, but I kept it there just in case someone wanted to make a donation to my mission.
> Q: Like a collection basket?
> A: Yeah.
>      . . .
> Q: Did people put money in the basket, typically?
> A: Yes.
> Q: Okay. Do you remember on this day around the time when the officers showed up, was there money in that basket beyond the one dollar you had put in?
> A: Yes.
> Q: Any idea how much?
> A: Between [$]50 and $70, estimation-wise.

Grant Dep. 32:2-33:4.  See also Def.'s SUF ¶ 9; Pl.'s Resp. to Def.'s SUF ¶ 9.

Plaintiff was approached by the police officers on duty at the Christmas Village, Officer Sauris and Officer Moffitt.  See Def.'s SUF ¶¶ 13, 32, 39; Pl.'s Resp. to Def.'s SUF ¶¶ 13, 32.  Officer Sauris' "face scrunched up in disgust" upon reading Plaintiff's sign, and he asked Plaintiff to leave Love Park.  See Def.'s SUF ¶ 13; Pl.'s Resp. to Def.'s SUF ¶ 13.  Officer Sauris did not

---

[2] Plaintiff's admissions with regards to his volume are inconsistent.  On one hand, plaintiff admits that his yelling was a reason that the police approached him.  See Def.'s SUF ¶ 39; Pl's Resp. to Def.'s SUF ¶39.  On the other hand, he contends that he did not yell, both in his deposition and twice in his response to the Defendant's statement of undisputed facts.  See Pl's Resp. to Def.'s SUF ¶¶ 5, 9; Grant Dep. 31:18-22.  Viewing the evidence in the light most favorable to Plaintiff, the Court will interpret these contradictory statements in aggregate as a denial that Grant yelled.

specify why Plaintiff needed to leave, but said "I'm just doing my job, you know."  See Def.'s SUF ¶ 14; Pl.'s Resp. to Def.'s SUF ¶ 14; Mot. Ex. H ("Sauris Dep.") at 46:5-9.  According to Plaintiff, Officer Sauris also said that he knew Grant and called him names, such as "con artist." See Def.'s SUF ¶ 15; Pl.'s Resp. to Def.'s SUF ¶ 15; Grant Dep. 41:4-6.

Plaintiff refused to leave and continued talking to Officer Sauris for approximately five (5) to seven (7) minutes before Officer Moffitt arrived.  Grant Dep. 40:6-42:10.  Plaintiff continued to refuse to leave; the officers cuffed Plaintiff and "dragged" him approximately thirty (30) feet to the outside edge of Love Park.  Id. at 41:20-42:6; Def.'s SUF ¶¶ 16-17; Pl.'s Resp. to Def.'s SUF ¶¶ 16-17.  After confirming that Plaintiff had no warrants for his arrest, the officers issued Plaintiff a Citation Violation Notice (CVN) for "failure to disperse" and told him not to return to the spot where they had removed him from.  Def.'s SUF ¶¶ 19-21; Pl.'s Resp. to Def.'s SUF ¶¶ 19-21. Upon receipt of the citation, Plaintiff crumpled the CVN in Officer Sauris' face and threw it in the trash.  Grant Dep. 52:15-22; Def.'s SUF ¶ 57; Pl.'s Resp. to Def.'s SUF ¶ 57.  Plaintiff then immediately returned to the spot within Love Park that the officers had removed him from.  Grant Dep. at 52:15-22, 54:24-55:22; Def.'s SUF ¶ 57; Pl.'s Resp. to Def.'s SUF ¶ 57.

It is undisputed that recruits receive training at the Police Academy on the Constitution and Bill of Rights, to include the First Amendment.  Def.'s SUF ¶ 29; Pl.'s Resp. to Def.'s SUF ¶ 29. It is also undisputed that Philadelphia police officers receive ongoing training on the First Amendment.  See Def.'s SUF ¶ 30; Pl.'s Resp. to Def.'s SUF ¶ 30.

## II.   Procedural History

Plaintiff filed the instant action on February 7, 2020.  See Compl. (ECF 2).  Pursuant to Plaintiff's Second Amended Complaint (ECF 55), filed October 5, 2021, Plaintiff alleges the following claims:

1. False arrest, in violation of the Fourth Amendment, pursuant to § 1983, against Officers Sauris and Moffitt (Count I);

2. Violations of the First Amendment, against Officers Sauris and Moffitt, pursuant to § 1983 (Count II);

3. First Amendment retaliation, against Officers Sauris and Moffitt, pursuant to § 1983 (Count III);

4. Declaratory judgment, pursuant to 28 U.S.C. § 2201(a), as to a ban on solicitation or leafletting in Love Park (Count IV); and

5. Municipal liability, against the City of Philadelphia (Count V)

See Second Am. Compl. ¶¶ 87-122.

Following significant discovery, the Court denied Defendants' Motion to Dismiss all claims and Plaintiff's Motion for Partial Summary Judgment.  See Order, dated Feb. 24, 2022 (ECF 80).  Further discovery ensued, and, on May 12, 2022, Defendants filed a motion for summary judgment as to all claims.  See Mot. (ECF 101).  Plaintiff responded on June 6, 2022, see Resp. (ECF 108), and Defendants replied on June 19, 2022, see Reply (ECF 111).

The Court held oral argument on August 19, 2022, including the parties' response to a number of questions.  See Letter, dated August 16, 2022 (ECF 116); Order, dated Aug. 17, 2022 (ECF 120).  The Court permitted the parties to submit supplemental briefing following oral argument.  See Letter from Plaintiff, dated Aug. 24, 2022 (ECF 125); Letter from Defendants, dated Aug. 29, 2022 (ECF 126).

## III.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "a

reasonable jury could return a verdict for the nonmoving party." Id.  At summary judgment, the

Court's role is "'to determine whether there is a genuine issue for trial,' it is 'not . . . to weigh the

evidence and determine the truth of the matter.'" Peroza-Benitez v. Smith, 994 F.3d 157, 164 (3d

Cir. 2021) (quoting Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019)).  The

Court should grant summary judgment only if, "constru[ing] all facts and inferences in favor of

the nonmoving party," Santini v. Fuentes, 795 F.3d 410, 419 (3d Cir. 2015), "the record taken as

a whole could not lead a rational trier of fact to find for the non-moving party," Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Police officers, embodying the authority of the state, are liable under § 1983 when they

violate someone's constitutional rights, unless they are protected by qualified immunity." Peroza-

Benitez, 994 F.3d at 165.  "[Q]ualified immunity protects all but the plainly incompetent or those

who knowingly violate the law." City of Tahlequah, Oklahoma, et al. v. Bond, 142 S. Ct. 9, 11

(2021) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  To determine whether a police

officer is entitled to qualified immunity, the Court conducts a two-step inquiry: (1) whether,

"[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the

officer's conduct violated a constitutional right," Davenport v. Borough of Homestead, 870 F.3d

273, 280 (3d Cir. 2017), and (2) "whether the right was clearly established, such that it would

[have been] clear to a reasonable officer that his conduct was unlawful in the situation he

confronted," Lamont v. New Jersey, 637 F.3d 177, 182 (3d Cir. 2011) (internal quotations

omitted).  "Courts may begin their inquiry with either prong." Peroza-Benitez, 994 F.3d at 165.

Whether a right was "clearly established" requires a two-part inquiry. Id.  First, the Court

must "define the right allegedly violated at the appropriate level of specificity[.]" Id. (quoting

Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012)).  This requires framing the right "in light of

the specific context of the case, not as a broad general proposition." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).   Second, the Court must ask "whether that right was 'clearly established' at the time of its alleged violation, i.e., whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violated that right.'"  Id. (quoting Saucier, 533 U.S. at 202).   "This is an 'objective (albeit fact-specific) question,' where '[an officer]'s subjective beliefs . . . are irrelevant.'"   Id. (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).   To answer this question, the Court must "first look[] to factually analogous Supreme Court precedent, as well as binding opinions from [the Third Circuit]," and then may consider whether there is a "robust consensus of cases of persuasive authority in the Courts of Appeals." Id. (internal quotation marks and citation omitted).   Finally, the Court "may . . . take into account district court cases, from within the Third Circuit or elsewhere." Id. at 165-66.

At summary judgment, the police officer as the movant has the burden of establishing an entitlement to qualified immunity.  Id. at 165 "When multiple officers seek to invoke qualified immunity, we separately consider each officer's actions." Id. (citing Grant v. City of Pittsburgh, 98 F.3d 116, 122-23 (3d Cir. 1996)).

## IV.   Discussion

### A.  False Arrest Under the Fourth Amendment, Pursuant to § 1983 (Count I)

Defendants seek summary judgment on several grounds.  First, that the defendant was never subjected to a custodial arrest, only an investigative stop.  See ECF 126 at 1-2.  Second, that given that there was only an investigative stop, the police officers had reasonable suspicion for the stop.  See id. at 2.  Third, that even if this was an arrest, Officer Sauris and Officer Moffitt had probable cause to believe that Plaintiff was violating Pennsylvania law and various city ordinances, to include disorderly conduct, noise violations, failure to disperse, solicitation within eight feet of

7

a business, and obstruction of public sidewalks.  Mot. at 6-7.  Grant disputes all of these grounds, arguing that this was a custodial arrest without probable cause (see Resp. at 16) and that whether the officers had any grounds for their conduct is, at the very least, a question that should be reserved for the jury.  See id.

### 1.      Plaintiff Did Not Experience a Custodial Arrest

As a threshold matter, Defendant argues that while Grant may have experienced a seizure, he was subjected to an investigative stop rather than a custodial arrest.  See ECF 126 at 1-2.  A "seizure" occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal quotation marks and citation omitted).  However, not all seizures are arrests.  It is well-established that limited seizures may be considered investigative stops, which do not violate the Constitution even in the absence of probable cause, provided that the officers have reasonable suspicion.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.").  See also Terry v. Ohio, 392 U.S. 1, 16 (1968).

The Supreme Court has not established a bright-line rule to distinguish a warrantless arrest from an investigatory stop.  When determining whether a seizure constitutes a stop or an arrest, the Committee on Model Civil Jury Instructions for the Third Circuit recommends considering a non-exclusive range of factors, includes whether the defendants diligently pursued the investigation or caused undue delay, whether handcuffs were used, whether the seized individual was moved to a police facility, and whether defendants stated plaintiff was under arrest.  See 3d

Cir. Model Jury Charge §§ 4.12.1-2.  Ultimately, however, the "reasonableness of the intrusion is the touchstone of our analysis."  United States v. Torres, 961 F.3d 618, 622 (3d Cir. 2020) (citing Baker v. Monroe Township, 50 F.3d 1186, 1192 (3d Cir. 1995)).  "The Supreme Court has emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  Id. (citing United States v. Sharpe, 470 U.S. 675, 685 (1985).

Viewing the facts in a light most favorable to Plaintiff, including undisputed facts, Plaintiff was not subjected to a custodial arrest.  Plaintiff was restricted in handcuffs for up to thirty minutes but does not contest that the officers were detaining him to confirm his identity and search for possible outstanding warrants, nor that he was released once the investigation was complete.  Grant Dep. 50:18 – 51:9.  Nor does Plaintiff allege undue delay by the officers.

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."  Adams v. Williams, 407 U.S. 143, 146 (1972) (citing Terry, 392 U.S. at 21-22).  Here, it was reasonable for the officers to verify that a person previously known to at least one officer, whom they believed to be violating the law at the time of seizure, did not have outstanding warrants.  The officers' decision to restrict Grant's movements for the thirty (30) minutes required to conduct that investigation "was reasonably related in scope to the circumstances which justified the interference in the first place[.]"  Terry, 392 U.S. at 20.

Grant points to the fact that he was taken away in handcuffs to a spot at the edge of the village as proof of arrest.  But in U.S. v. Foster, the suspect was handcuffed and transported a short distance during an investigative stop.  891 F.3d 93, 106-07 (3d Cir. 2018).  The Third Circuit held that such actions did not inherently escalate the seizure from a stop into an arrest.  Id.  See also

United States v. Scott, 816 F. App'x 732 (3d Cir. 2020) (NPO) (holding that handcuffing individual and nineteen-minute detainment in police vehicle during investigation related to robbery did not inherently elevate investigative stop to de facto arrest).  Similarly, in U.S. v. Sharpe, the Supreme Court held that a twenty-minute detention was not unreasonable while the officer pursued the investigation in a diligent and reasonable manner" and did not delay unnecessarily. 470 U.S. at 687-88.  Here, the Plaintiff was only taken to the edge of the village and was permitted to re-enter the village directly afterwards, where he began preaching again and no further police action was taken.  Grant Dep. 52:15 – 53:4.  Similarly, while Plaintiff received a citation, the Supreme Court has declined to analogize the issuance of a citation to a custodial arrest.  See Knowles v. Iowa, 525 U.S. 113, 117 (1998).  There is also no evidence on the record establishing that the officers told Plaintiff he was under arrest.  Taken together, these circumstances only establish that Plaintiff was subjected to an investigative stop, not an arrest.

### 2.   The Officers had Reasonable Suspicion for an Investigative Stop

Since the seizure was only an investigatory stop, Defendants are only required to show that the officers had reasonable suspicion that the suspect had violated the law.  "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  See Wardlow, 528 U.S. at 123 (internal quotations omitted).  An officer must articulate "more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity."  Id. at 123-24 (internal quotations and citation omitted).

The undisputed facts show that the officers had a reasonable suspicion that Grant had violated both the disorderly conduct and solicitation ordinances.  As detailed below, no reasonable jury could find that the officers lacked probable cause to make an arrest under the solicitation

ordinance and disorderly conduct statute.  See infra Sections IV.A.4 and IV.A.5.  This is more than sufficient to satisfy the less demanding reasonable suspicion standard.  Accordingly, Defendants are entitled to qualified immunity for Plaintiff's seizure.

### 3.    Law Governing Probable Cause for an Arrest

Even if Grant's seizure constituted a custodial arrest, the officers had probable cause to arrest Grant for disorderly conduct and violation of the city ordinance regarding solicitation. Summary judgment is proper as to his false arrest claim.  To establish a claim for false arrest under the Fourth Amendment, a plaintiff must show: "(1) that there was an arrest; and (2) that the arrest was made without probable cause."  Harvard v. Cesnalis, 973 F.3d 190, 199 (3d Cir. 2020) (quoting James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012)).

Probable cause exists when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003) (citing Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)).  This analysis requires a "totality-of-the-circumstances approach."  Reedy v. Evanson, 615 F.3d 197, 211 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)).  "Although the probable cause inquiry is usually a question for the jury, courts 'may conclude in the appropriate case . . . that probable cause did exist as a matter of law if the evidence, viewed most favorable to [the] [p]laintiff, reasonably would not support a contrary finding.'"  Karns v. Shanahan, 879 F.3d 504, 523 (3d Cir. 2018) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).  "Whether any particular set of facts suggest that an arrest is justified by probable cause requires an examination of the elements of the crime at issue."  Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005).  The crime an individual is ultimately charged

with is "irrelevant" to the probable cause analysis, id., and "[p]robable cause need only exist as to [one of the] offense[s] that could be charged under the circumstances", Reedy v. Evanson, 615 F.3d 197, 211 (3d Cir. 2010).

### 4.    The Officers Had Probable Cause to Arrest Grant for Violating the Solicitation Ordinance

Defendants argue that the officers had probable cause to arrest Grant for violation of Philadelphia City Ordinance Code § 10-611. PHILA., PA., CODE § 10-611.  Under § 10-611(4)(b), it is prohibited for individuals to:

> [s]olicit money for any purpose on the public sidewalk in any manner, within an eight-foot (8') radius of any building entrance, or within an eight-foot (8') radius of any vending cart.

Plaintiff does not contest that he stationed himself within seven (7) to ten (10) feet of the nearest vendor.  See Def.'s SUF ¶ 4; Pl.'s Resp. to Def.'s SUF ¶ 4.  Since Plaintiff stood either within or just outside of the prohibited distance required by the statute, a reasonable officer at that moment could conclude that he was within the prohibited distance from a vendor.  Probable cause does not require the officers to use a tape measure.  Plaintiff also concedes that he had a collection basket at his feet with a dollar in the corner and money inside.  See Def.'s SUF ¶ 9; Pl.'s Resp. to Def.'s SUF ¶ 9.  A reasonable officer could conclude from these facts that Plaintiff was impermissibly engaged in solicitation within eight feet of a vendor.  Therefore, the police had probable cause that Plaintiff was violating the City's solicitation ordinance.

Plaintiff contends that he was not engaged in solicitation.  See Pl.'s Resp. to Def.'s SUF ¶ 49.  But Grant had a basket with "a dollar folded on the crevice of the corner in case someone wanted to throw something in there."  Grant Dep. 32:5-12.  While Plaintiff insists his subjective intent was not monetary, he also concedes that he had the basket in case someone wanted to put money inside.  Id.  Whether or not money was his primary goal, Grant was nevertheless soliciting

funds and, at the very least, a reasonable officer observing the basket at the scene could conclude that he was soliciting.  Put simply, Grant's actions spoke louder than his words.

Indeed, both officers testified that they actually believed that Grant's behavior constituted solicitation as well:

> [Mr. Considine]: Is it your impression that soliciting includes handing out leaflets of some kind of political or spiritual message or standing up and doing what Mr. Grant does, speaking in public about his message?
> Mr. Cooper: Objection to form.  You're asking him what solicitation means?
> Mr. Considine: Yes, his interpretation.
> . . .
> [Officer Moffit]: Yes, so in a public space, in a park or whatever, having your tray out, just in my opinion, there's people walking through Love Park and Christmas Village and asking for money, that's basically what we saw as your client doing.

Moffit Dep. 28:14-29:9.

> Q: In your training in the Philadelphia Police Department, were you told that it was illegal for someone to have a collection plate while they were speaking at a public park?
> . . .
> A: Within a business. I answered that.
> Q: You're saying within a business. What does within a business?
> A: Yes.
> Q: Was he inside a business when he was doing this?
> A: Within the area of a business. I'm sorry.
> Q: How do you define area of a business? How far?
> A: Within eight feet.
> Q: Within eight feet?
> A: Yes.
> Q: Is there a specific statute that states that?
> A: I can't recall the specific statute but yes there is one.

Sauris Dep. 40:15-41:14.

Plaintiff does not dispute the officers' testimony that they believed that he was soliciting.[3]   On the contrary, the excerpt of the Sauris deposition testimony above is cited by Plaintiff as an undisputed fact.   See Plaintiff's SUF ¶ 39.   While the subjective view of the police officers that Grant was soliciting is not dispositive, it does reinforce that Plaintiff's behavior had the appearance of solicitation.

In the alternative, Plaintiff suggests that this solicitation ordinance only applies to sidewalks and does not apply to public parks.   See Resp. at 6.   There is no dispute that Plaintiff's conduct took place on a paved right of way for exclusive pedestrian use within Love Park.   In fact, the pavement there extends directly from the side of the road.   See Resp. Ex. 9, Ex. 11; ECF 71, Ex. 6.   A reasonable officer could conclude that the section of Love Park near the Love Sign is simply an extension of the sidewalks, as there is no clear demarcation between sidewalk and park.

---

[3]      Plaintiff insinuates that the officers' stated rationale from their deposition testimony was pretextual and that they were actually motivated by animus, but this is not relevant to determining whether or not there was probable cause – an objective inquiry.   See Nieves v. Bartlett, 139 S. Ct. 1715, 1724 (2019) ("In the Fourth Amendment context, however, we have almost uniformly rejected invitations to probe subjective intent.") (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 737 (2011)).   Plaintiff also makes a cursory allegation that the officers offered a different rationale by alleging in his response that "Grant complained that police told him he could not preach, leaflet and or do so with a collection plate." Resp. at 16.   But this appears nowhere in the record and contradicts Plaintiff's express testimony that the police did not offer Grant a rationale at the time:

> Q: At that time, did he tell you the reason that he was asking you to leave.?
> A: No.
> Q: Did he mention anything about the basket?
> A: No. I asked him, I said: Why are you making me leave? And he didn't give me a reason. All he said is: You have to go.
> Q: All right.
> A: He said I'm just doing my job, you know?

Grant Dep. 39:21-40:5.   Given its contradiction of Plaintiff's own express testimony, the Court cannot read this cursory assertion as Plaintiff actually contesting that the officers offered a different rationale for their actions.

Plaintiff provides no authority to suggest that the ordinance defines "public sidewalk" to exclude a walking space exclusively for pedestrian use within a public park. Indeed, there is no formal definition in the statute or binding legal authority determining the proper scope of the term "public sidewalk" in this ordinance. See § 10-611. PHILA., PA., CODE § 10-611. Whether or not the location where Plaintiff stood was legally a "public sidewalk" covered by the statute, it was objectively reasonable for the officers to conclude that it was.[4] Therefore, the officers had probable cause to believe that Plaintiff's activity in this location violated the solicitation ordinance.

Finally, relying on Cantwell v. State of Connecticut, Plaintiff argues that bans on solicitation are unconstitutional as applied to religious groups. See ECF 125 at 2. Plaintiff mischaracterizes Cantwell's holding. Cantwell is unequivocal that "the state… is free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience." 310 U.S. 296, 306-07 (1940). Cantwell only holds that it is unconstitutional to assess someone's religious practices in determining whether a party had a right to solicit. Id. at 307.

### 5.   The Officers Had Probable Cause to Arrest for Violating Pennsylvania's Disorderly Conduct Statute

---

[4]     The Court need not definitively determine whether or not the location where Plaintiff stood is correctly defined as public sidewalk as a matter of law. Even if it is not, the Supreme Court held in Heien v. North Carolina that a reasonable officer may make *objectively reasonable* errors of law in seizures without violating the Fourth Amendment, just as reasonable errors of fact are permissible. 574 U.S. 54, 60-63 (2014). This allows officers to make objectively reasonable assessments when they "suddenly confront a situation in the field as to which the application of a statute is unclear – however clear it may later become." Id. at 67 (internal quotations omitted). Even if it were a mistake of fact *or* a mistake of law for the officers to conclude that the pavement near the Love Sign was a public sidewalk covered by the statute, it was objectively reasonable for them to do so in the absence of legal authority to the contrary.

In the alternative, officers Sauris and Moffitt had probable cause to arrest Plaintiff pursuant to, <u>inter alia</u>, 18 P.C.S. § 5503,[5]  Pennsylvania's disorderly conduct statute, 18 P.C.S. § 5503(a), which provides:

> [a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly created a risk thereof, he: (1) Engages in fighting or threatening, or in violent or tumultuous behavior; (2) Makes unreasonable noise; (3) Uses obscene language, or makes an obscene gesture; or (4) Creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

"Public" is defined as "affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public."  § 5503(c).  Pursuant to § 5503(a)(4), a "hazardous condition" is one that "involves danger or risk," specifically those that raise the "possibility of injuries resulting

---

[5]     Defendants also argue that they had probable cause to arrest Grant pursuant to Phila. Code §§ 10-404, 10-409, 10-611 & 10-615.  Philadelphia City Ordinance Code **§ 10-404** empowers a police officer to issue a CVN,

> in order to prevent, restrain or abate notice of excessive vibration prohibited by this Chapter or Regulations adopted hereunder, or the violation of the provisions of any order made under § 10-409.

Pursuant to Philadelphia City Ordinance Code **§ 10-615(2)(b)**,

> Where three or more persons are engaged in a course of disorderly conduct in a public place which causes or may reasonably be expected to cause substantial harm or serious inconvenience, annoyance or alarm and a police officer or other person authorized to enforce ordinances has ordered the participants and other persons in the immediate vicinity to disperse, no person shall refuse or knowingly fail to obey such order.

Philadelphia City Ordinance Code **§ 10-611(2)(l)** prohibits an individual from obstructing a public sidewalk by "sit[ting], stand[ing], l[ying] or otherwise us[ing] the public sidewalk, or plac[ing] one's belongings or other objects upon the public sidewalk, in such manner as to unreasonably and significantly impede or obstruct the free passage of pedestrians."

from public disorders." <u>Commonwealth v. Williams</u>, 574 A.2d 1161, 1164 (Pa. Super. Ct. 1990); <u>see</u> <u>Clifton v. Borough of Eddystone</u>, 824 F. Supp. 2d 617, 625 (E.D. Pa. 2011) (Joyner, J.).

"Section 5503 as a whole is aimed at preventing public disturbance, [and] it accomplishes this aim by focusing upon certain individual acts, which, if pursued with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, constitute the offense of disorderly conduct." <u>Commonwealth v. Fedorek</u>, 946 A.2d 93, 100 (Pa. 2008). The specific intent requirement "may be met by a showing of a reckless disregard of the risk of public inconvenience, annoyance, or alarm, even if the [defendant's] intent was to send a message to a certain individual, rather than to cause public inconvenience, annoyance, or alarm." <u>Commonwealth v. Troy</u>, 832 A.2d 1089, 1094 (Pa. Super. 2003). "[T]he offense of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community." <u>Commonwealth v. Hock</u>, 728 A.2d 943, 947 (Pa. 1999) (internal quotations and citation omitted). Rather, "it is intended to preserve the public peace." <u>Id.</u> "The cardinal feature of . . . disorderly conduct is public unruliness which can or does lead to tumult and disorder." <u>Id.</u> at 946 (internal quotations and citation omitted).

Courts regularly find probable cause as a matter of law for disorderly conduct when no reasonable jury could conclude that the defendants lacked probable cause under the circumstances. For example, in the recent and very relevant Supreme Court case <u>Nieves v. Bartlett</u>, plaintiff-appellee had been drinking and spoke in a loud voice while standing close to a police trooper. 139 S. Ct. 1715, 1720 (2019). The Supreme Court affirmed lower court rulings that the police had probable cause to arrest plaintiff as a matter of law. <u>Id.</u> at 1728. Similarly, in <u>Startzell v. City of Philadelphia, Pennsylvania</u>, the Third Circuit affirmed the lower court's finding that the police had probable cause as a matter of law. 533 F.3d 183, 205 (3d Cir. 2008). There, evangelist preachers

17

refused to leave a crowded event where they were blocking access to vendors and created risk of unrest by shouting at LGBTQ individuals that they were sinning and going to hell. Id. at 190-91. In Dreibelbis v. Clark, the panel affirmed a summary judgment finding that the officer had probable cause as a matter of law to arrest for disorderly conduct because of reports of plaintiff's "yelling… shouting" and "attempting to push" security personnel in a fairground. 813 Fed.App'x 64, 66-67 (3d Cir. 2020) (NPO). In each of these cases, the Third Circuit affirmed the district court's findings that no reasonable jury could found that a reasonable officer lacked probable cause.[6]

Viewing the facts in the light most favorable to Grant, a reasonable officer could nevertheless conclude from the "totality of the circumstances" that Grant's behavior constituted disorderly conduct. On December 21, 2019—four days before Christmas—Grant had positioned himself inside a very crowded Christmas Village, approximately ten (10) feet from the LOVE sign, in the southeast quadrant of Love Park, surrounded by Christmas Village vendor booths. See Def.'s SUF ¶¶ 2, 4, 37; Pl.'s Resp. to Def.'s SUF ¶¶ 2, 4, 37. Grant concedes that some observers at the Christmas Village felt that he was acting "crazy," and viewed his conduct as that of a

---

[6] There are many other examples of courts finding probable cause for disorderly conduct as a matter of law – and the Third Circuit affirming them. See, e.g., Whiting v. Bonazza, 545 F. App'x 126, 128-29 (3d. Cir. 2013) (NPO) (affirming summary judgment holding that police officers had probable cause to arrest plaintiff under § 5503 because plaintiff was engaged in "tumultuous behavior" and making "unreasonable noise" in a vacant lot and noting that "public unruliness is a sine qua non of disorderly conduct") (internal quotation marks and citation omitted); Bergdoll v. City of York, 515 F. App'x 165, 169 (3d. Cir. 2013) (NPO) (affirming district court's holding as a matter of law that police officer had probable cause to arrest plaintiff under § 5503 because of plaintiff's arguing, as well as hostile and confrontational language, even though it lacked profanity); Farmer v. Decker, 353 F. Supp. 3d 342, 347-48 (M.D. Pa. 2018) (Kane, J.) (finding probable cause as a matter of law in grant of summary judgment under § 5503 because of Plaintiff loudly calling a woman's children "liars" and "little assholes" at a church Easter egg hunt); Fleck v. Trustees of Univ. of Penn., 995 F. Supp. 2d 390, 404-05 (E.D. Pa. 2014) (Dalzell, J.) (finding probable cause as a matter of law in grant of summary judgment under § 5503 because evangelist preachers stationed by entrance to mosque were preaching loudly and yelling at attendees at Muslim service, violating disorderly conduct statute).

"troublemaker" as he addressed a crowd including children, staff in hand, in an elevated voice, while soliciting funds through the use of a collection basket.  Grant Dep. 28:3-14, 31:18-22; Def.'s SUF ¶¶ 3, 5, 12; Pl.'s Resp. to Def.'s SUF ¶¶ 3, 5, 12.  When the Officers approached Grant, Grant refused to leave.  Grant Dep. 40:6-42:10.

Officer Moffit testified that he believed that Grant was engaged in disorderly conduct and that the context of the Christmas Village contributed to his conclusion that Defendant engaged in disorderly conduct – a belief that Plaintiff has not disputed:

> Q: What constitutes a public nuisance that would be sufficient for you to tell someone to leave when they're speaking in a public area?
> . . .
> A: So if I feel that the person that is speaking in a public area, there's a lot of people in that area, if I feel that it's a nuisance to the area and it can potentially cause problems, then I have the right to ask that person to leave.  Specifically, in an area where there are a bunch of families and children and everything.  Your client is standing there with a stick and speaking loudly, to me that is my discretion if I feel that he is causing problems or causing fear or causing harm, no harm, causing fear to maybe family and children, therefore it's my discretion to go outside of the park.

Moffit Dep. 17:3-24.[7]  See also Pl.'s Counterstatement ¶ 50.

> Q: Can you tell me what disruptive behavior Mr. Grant was engaged in that day?
> . . .
> A: [I]n my opinion, as I said there was Christmas Village, there was families, there was kids, I believe that he was causing a disturbance to the crowd that was there.

Moffit Dep. 54:5-17.

---

[7]     As noted above and below, the Court must view the facts in light favorable to Plaintiff and therefore conclude that Grant's voice was only elevated and did not constitute yelling.  See discussion infra Section IV.C.

Taken together, a reasonable officer could conclude that Grant's actions "caused" and "unjustifiably risked a public disturbance" that upended the public peace.[8] Hock, 728 A.2d at 946-47.  Thus, no reasonable jury could conclude that the Officers arrested Grant without probable cause for violating Pennsylvania's disorderly conduct statute.

This case is distinguishable from cases in which finding summary judgment as a matter of law was not appropriate.[9]  In Snell v. City of York, Pennsylvania, an anti-abortion protestor was arrested for disorderly conduct after repeatedly approaching individuals accessing the clinic through an alley, despite police warnings for protestors not to enter the area.  564 F.3d 659, 672 (3d Cir. 2009).  The Third Circuit overturned the district court's finding of probable cause due to a lack of clarity regarding what actually happened during the confrontation at issue and the district court's apparent reliance on the *prospective* creation of a hazardous environment under Section 5503(a)(4) rather than an actual hazardous environment.  See id.

First, the Court does not rely on prospective creation of disorder here: the defendant was engaging in disorderly behavior already when the police approached him that "unjustifiably risked

---

[8]    Where applicable, courts can consider the context of crowded holiday celebrations in determining whether there is probable cause for a disorderly conduct violation.  See Startzell v. City of Philadelphia, 2007 WL 172400 at *13-14 (E.D. Pa. Jan. 18, 2007) (Stengel, J.), aff'd sub nom. Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183 (3d Cir. 2008) (finding that police had probable cause as a matter of law for disorderly conduct in part because large crowd at celebratory event was becoming hostile largely as a result of plaintiffs' conduct); Anderson v. City of Naples, 501 F. App'x 910, 917 (11th Cir. 2012) (NPO) (finding probable cause to arrest Plaintiff for breach of peace after disrupting events at Martin Luther King Day in a park and scaring children while wearing a Gorilla suit).

[9]    Plaintiff also relies on factual similarities between this case and Victory Outreach Ctr. v. Melso, 313 F. Supp. 2d 481, 481 (E.D. Pa. 2004).  Resp. at 7.  This opinion, in which the plaintiff was represented by the same lawyer as Plaintiff here, is distinguishable on several grounds.  First, there was no fact showing violation of a solicitation ordinance; second, the court only considered probable cause and did not consider the concept of an investigative stop; and third, there has been a clear development by the Supreme Court giving more legal latitude to police conduct in cases with similar issues, such as Nieves.

a public disturbance[.]"  Hock, 728 A.2d at 946-47.   Second, unlike in Snell, Grant was not

prohibited from accessing Love Park altogether.  He entered the park without any interference and

even returned to the same spot to preach immediately after he was released from handcuffs.  Grant

Dep. 52:15 – 53:4.  Finally, there is no complete lack of clarity as to what actually occurred in this

incident as there was in Snell.  Despite minor disputes, the parties agree on the facts that are

dispositive and the general narrative of events.

Therefore, the Officers had probable cause to arrest Grant for disorderly conduct.[10]  No

reasonable jury could find otherwise.[11]

### B.  First Amendment Claims, Pursuant to § 1983 (Count II & III)

Defendants  move  for  summary  judgment  on  Grant's  First  Amendment  and  First

Amendment retaliation claims, brought against Officer Sauris and Officer Moffitt (Counts II and

III).  Defendants argue that Grant's First Amendment claims fail because there is nothing in the

record to suggest that the Officers took action based on the content of Grant's speech.  Mot. at 9-

10.  Defendants also suggest that the Officers are entitled to qualified immunity as to Grant's First

Amendment claims because "it is not clearly established that an arrest supported by probable cause

---

[10]      The qualified immunity analysis requires the Court to look at the conduct of each officer
individually.  Here, the record, taken in the light most favorable to Grant, inextricably links Officer
Sauris's and Officer Moffit's actions in the arrest of Grant.  See, e.g., Grant Dep. 42:7-13 ("Q:
Had the other officer shown up at the time he cuffed you?  A: Yeah. They cuffed me together. It
was two of them that cuffed me together.  Q: Okay.  Did they both physically touch you during
that process?  A: Yeah.").  Therefore, the Court has consolidated its analysis of their entitlement
to qualified immunity.
[11]      The  Court  need  not  address  whether  the  Officers  had  probable  cause  to  arrest  Grant
pursuant  to  the  failure  to  disperse,  sidewalk  obstruction,  or  excess  noise  provisions  of  the
Philadelphia City Ordinance cited by Defendants.  See Reedy, 615 F.3d at 211.  Nor is the fact that
Grant ultimately received a CVN for "failure to disperse" dispositive as to whether the Officers
had probable cause to arrest grant for disorderly conduct.  See Wright, 409 F.3d at 602.

can give rise to a First Amendment violation." Id. (citing Primrose v. Mellott, 541 F. App'x 177, 180 n.2 (3d Cir. 2013) (NPO)).

As to the First Amendment retaliation claim, Grant counters that the record supports the existence of a causal connection between his protected speech and the alleged retaliation, given that he "complained that police told him he could not preach, leaflet and or do so with a collection plate . . . [and] [w]ithin minutes he was handcuffed and cited without probable cause."  Resp. at 16.[12]  And even if there was probable cause, Grant alleges that the record shows that the Officer's knowledge of the content of his speech—as exhibited by them allegedly calling him a "con artist" and showing hostility toward his preaching—is suggestive of retaliation.  Id. at 16-17.

### 1.    First Amendment Violation Claim (Count II)

To analyze whether a police officer has violated an individual's First Amendment right to free speech, pursuant to § 1983, the Court conducts a three-part inquiry: (1) "whether the First Amendment protects the speech at issue"; (2) the "nature of the forum"; and (3) "whether the [government's] justifications for exclusion from the relevant forum satisfy the requisite standard." Turco v. City of Englewood, 935 F.3d 155, 161-62 (3d Cir. 2019).  However, the Court will first exercise its discretion to consider whether Grant's alleged right was "clearly established" to determine whether qualified immunity shields the government officials here from liability. Peroza-Benitez, 994 F.3d at 165.

In determining whether the officers violated a "clearly established" right, the Court must define the right at issue specifically.  Here, the specific First Amendment right is not the general right to be free from interference with one's speech, but to be free from an arrest that is otherwise

---

[12]      Plaintiff's cursory allegation in his response that "Grant complained that police told him he could not preach, leaflet and or do so with a collection plate" contradicts Plaintiff's express testimony that the Police told him no such thing.  See supra note 3.

supported by probable cause.[13]  The Supreme Court recently held in Nieves v. Bartlett that there

is typically no First Amendment right to be free from a *retaliatory* arrest if there was probable

cause.[14]  139 S. Ct. 1715, 1723 (2019).  No decision in the Third Circuit between the Nieves

decision in May 2019 and Grant's arrest in December 2019 held that there is a clearly established

right to be free from a *non-retaliatory* arrest even if probable cause is found.[15]  Nor had a "robust

consensus of cases of persuasive authority in the Courts of Appeals" formed establishing such a

right during that timeframe.  Peroza-Benitez, 994 F.3d at 165.

Given the holding of Nieves, a reasonable officer could conclude that there is no First

Amendment right to be free from a *non-retaliatory* arrest when probable cause has been found.  A

retaliatory arrest fully encompasses the same restriction of expression as a comparable non-

retaliatory arrest, but also includes objectionable retaliatory animus, which would be

unconstitutional if it was the "but for" cause of the arrest.  Nieves, 139 S. Ct. at 1722.  Since the

Supreme Court had held just months prior that there is no First Amendment right to be free from

arrest when there is probable cause *and* the presence of an objectionable animus, a reasonable

police officer at the time of the arrest could have interpreted Nieves to hold that there was no First

---

[13]     Plaintiff suggests that the First Amendment rights violated are "freedom of speech" and
"exercise of religion." See ECF 125, 126.  These are precisely the "broad general propositions"
that the Supreme Court has held are not particularized enough to be clear to a reasonable officer.
Reichle v. Howards, 566 U.S. 658, 665 (2012).  The Court instead uses the definition of the First
Amendment right here proposed by Defendants and defined by the Supreme Court in Reichle. Id.
[14]     A narrow exception applies when the plaintiff provides objective evidence that police do
not typically arrest individuals for the violation in question.  Nieves, 139 S. Ct. at 1727.  See also
infra Section IV.B.2.
[15]     No Third Circuit opinions cited Nieves between the date it was decided and the date of
Grant's arrest.  Only six district court decisions within the circuit cited Nieves and none held that
there was a First Amendment right to be free from *non-retaliatory* arrest with probable cause.  It
is doubtful that any case could "clearly establish" such a right without distinguishing Nieves.
None attempted to do so.

Amendment right to be free from arrest in the same circumstances but without the harmful, objectionable animus.

This possibility is sufficient for the Court to find that the right had not been clearly established at the time of the arrest.  In <u>Reichle</u>, the Supreme Court observed that it was possible that a reasonable official "could have interpreted" that the Supreme Court's holding in <u>Hartman</u> requiring an absence of probable cause in retaliatory prosecution cases "also applied to [retaliatory] arrests."  <u>Reichle</u>, 566 U.S. at 667.  This was enough for the Supreme Court to find that the right to be free from retaliatory arrest with probable cause was not clearly established at the time.  <u>Id.</u> Despite previous circuit precedent which held that this right had been clearly established and despite the fact that <u>Hartman</u> only applied to retaliatory arrest claims, the <u>Reichle</u> Court held that "reasonable officers could have questioned whether the rule of <u>Hartman</u> also applied to arrests." <u>Id.</u> at 666.

Here, a reasonable officer could believe that the <u>Nieves</u> holding regarding retaliatory arrests also applies to non-retaliatory arrests.  Indeed, it would be nonsensical for a reasonable officer to interpret <u>Nieves</u> to hold that they could only arrest speakers in public with probable cause without violating the First Amendment if the officer *actually* had a retaliatory animus, but that animus was not the "but for" cause of the arrest.  And even if Plaintiff could point to cases before <u>Nieves</u> where the Third Circuit held such a right exists, a reasonable officer could conclude that <u>Nieves</u> abrogated their holdings, just as the Supreme Court held that <u>Hartman</u> justified questioning prior circuit precedent that was directly on point in <u>Reichle</u>.  <u>Id.</u>

It was not clearly established at the time of Plaintiff's seizure that a reasonable officer would understand that it would be a First Amendment violation to arrest someone speaking in

public even when there is probable cause.  Therefore, Officer Sauris and Officer Moffitt are entitled to qualified immunity, as to this claim.

### 2.        First Amendment Retaliation Claim (Count III)

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves, 139 S. Ct. at 1722 (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)).  "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." Id. (quoting Hartman, 547 U.S. at 256).

To establish a First Amendment retaliation claim, a plaintiff must show the existence of a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." Nieves, 139 S. Ct. at 1722.  As noted above, when the alleged retaliatory conduct involves an arrest, the existence of probable cause generally defeats a First Amendment retaliation claim.  Id. at 1727; see also Jacobs v. City of Phila., 836 F. App'x 120, 121 (3d Cir. 2020) (NPO) ("When the alleged retaliation takes the form of criminal charges, causation requires a showing that the charges were not supported by probable cause.") (citing Miller v. Mitchell, 598 F.3d 139, 154 (3d Cir. 2010)); Roy v. City of Monroe, 950 F.3d 245, 255 (5th Cir. 2020) (affirming the district court's finding that the plaintiff's First Amendment retaliation failed because he had not shown an absence of probable cause).

However, "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Nieves, 139 S. Ct. at 1727.  This is because, "[i]n such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a

means of suppressing speech.'" Id. (quoting Lozman v. City of Riviera Beach, 138 S. Ct. 1945, 1953 (2018)).

Plaintiff fails to provide objective evidence demonstrating that officers typically use their discretion not to make arrests for disorderly conduct when they have probable cause.[16] Given that the officers had probable cause to arrest Grant for disorderly conduct, see supra Section IV.A.3., a crime under Pennsylvania law that regularly results in arrests,[17] Grant's First Amendment retaliation claim fails and the Officers are entitled to qualified immunity as to Count III.[18]

---

[16]     On the contrary, Plaintiff offers a list of allegedly similar incidents where police arrested individuals engaged for disorderly conduct or related offenses while attempting to engage in otherwise protected speech expressing a range of viewpoints. Grant does so to support his argument that Philadelphia police training is inadequate in preventing First Amendment violations by the police. See Pl.'s Counterstatement passim. Yet Plaintiff also alleges that police do not typically arrest similarly situated individuals to suggest viewpoint discrimination against Grant. See ECF 125 at 1. Plaintiff cannot have it both ways and thus does not qualify for the exception to the Nieves rule.

[17]     Police routinely arrest individuals under § 5503 for disorderly conduct, as reflected in Third Circuit case law. See, e.g., Diener v. Reed, 77 F.App'x 601, 609-11 (3d Cir. 2003) (NPO) (analyzing multiple arrests of certain evangelists on numerous occasions for disorderly conduct); Farmer, 353 F. Supp. 3d at 356-57 (finding probable cause as a matter of law that plaintiff had violated disorderly conduct statute for confrontation in church in which plaintiff used expletives to describe children); Marcavage v. City of Philadelphia, 778 F.Supp.2d 556, 566-67 (E.D. Pa. 2011) (Robreno, J.) (finding the arrest of Christian, anti-homosexual protesters at Pride event for disorderly conduct did not violate First Amendment rights of those protesters); Whiting v. Bonazza, 545 F. App'x 126, 128 (3d Cir. 2013) (NPO) (affirming finding of probable cause for arrest of Plaintiff under § 5503 for loudly shouting at neighbors violating neighborhood curfew and refusing to cease after police warning); Fleck, 995 F.Supp.2d at 406 (finding police officers did not violate the First Amendment rights of evangelist preachers for arrest after preaching disruptively in doorway of a mosque).

[18]     The Court need not address Plaintiff's claim that the police officer calling him a "con artist" and scrunching his face in disgust at Plaintiff's sign establishes a retaliatory motive. Even assuming for sake of argument that the officer actually had that subjective animus, the retaliatory arrest claim fails as a matter of law under Nieves because there was probable cause and no exception applies.

### C.  Defendants Sauris and Moffit are Entitled to Qualified Immunity as to All Alleged Constitutional Violations

After a detailed review of the factual record, including all of the depositions that were taken and were included as attachments in the City's Motion for Summary Judgment, as well as counsel's filing of the Statement of Undisputed Facts, responses, letters and Plaintiff's memorandum, ECF 108, all of which have been reviewed and the highlights of which have been discussed above, the Court must observe that there are, perhaps unusual in a case of this nature, very few disputed facts.

One undisputed fact of legal significance is the fact that the circumstantial evidence is clear that Defendant was soliciting donations during his presence at Love Park.  The Court must conclude that Defendant, given his extensive experience with making similar appearances in prior years in Love Park and other locations, had reason to know that soliciting within eight feet of a vendor was a violation of a City of Philadelphia ordinance – and this violation, without more – authorized the police to take action removing plaintiff, forcibly since plaintiff had refused to leave Love Park voluntarily, to the perimeter where the police gave him a citation.

The law is settled that giving an individual a citation for a violation of a city ordinance is not an arrest and therefore probable cause need not be shown.

The Court could stop the analysis at this point, and conclude that the police acted lawfully, that handcuffing Plaintiff does not constitute an arrest, that probable cause, if relevant, existed, and that the right that Plaintiff is asserting was not "clearly established" - - thus, the police officers are entitled to qualified immunity and summary judgment should be granted.

Nonetheless, a full analysis of remaining issues is warranted, if only because this case is likely to be appealed, and thus the Court will set forth in full its rulings and conclusions on the other issues raised by the parties.

There is a disputed issue as to whether Mr. Grant was yelling/screaming in a loud volume or just speaking normally as Grant himself asserted in his deposition.  The Court, for purposes of ruling on the Motion for Summary Judgment, must accept Grant's assertions on this point, and thus rejects any conclusion based on Officer Moffitt's deposition testimony that Grant was yelling/screaming at a high volume.

Nonetheless, there is other testimony by both police officers not contradicted by Grant that explained the reasons for their actions and is therefore part of the underlying record that can be considered in ruling on Defendants' Motion for Summary Judgment.

In addition to the fact that Mr. Grant was soliciting, both police officers gave testimony, summarized above, that warranted their acting as they did in their discretion, to avoid any possible confrontations with the many individuals enjoying the Christmas Village, to remove plaintiff from the area where he was standing, and give him the citation.

The record is also undisputed that Mr. Grant refused the police officers request to leave. Therefore, the police officers were faced with a question, either to "back down and/or back off" and allow Grant to continue – and risk whatever might follow – or to take further action to forcibly but temporarily remove Grant from the area.

The Court finds for the reasons stated above that the police officers' decision to remove Grant from the area was justified, by the totality of circumstances, and was a decision the officers were entitled to make, at that moment of time and space, based on their experience and as they testified, in their "discretion."[19]

---

[19]    Police officers conduct thousands of arrests every day – "a dangerous task that requires making quick decisions in circumstances that are tense, uncertain, and rapidly evolving." Nieves, 139 S. Ct. at 1724 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)) (internal quotation marks omitted).  As the Supreme Court has observed, the "specialized training and experience" that police officers gain in the line of duty "routinely" play a "significant role" in "conducting law enforcement investigations."  Kansas v. Glover, 140 S. Ct. 1183, 1190 (2020)

The Court recognizes, and has considered, alternatives that could have been employed by the police, such as taking hold of the plaintiff with their hands and just forcibly walking him out to the perimeter of Love Park where they could give him the citation, and thus avoid handcuffing.

The Court has considered the possibility that the officers could have given Mr. Grant the citation while he was standing in that area without moving him, but did not do that.  It is also appropriate to ask whether the police officers should have given Mr. Grant more specific reasons as to why they were asking him to leave the scene, but they did not do that.

The Court has considered all these alternatives under a traditional "could have/should have" argument – which may be an appropriate argument in a motion for summary judgment in a case of this nature, but it is not required or persuasive in this case.

However, the Court rejects any contentions that Plaintiff has made along these lines – that the police action was unduly forceful and amounted to an unlawful arrest, for which Plaintiff is entitled to damages.

The Court does not consider this case only from the view of a Judge sitting in a Courthouse --- but must look at the circumstances as they existed at that date and time, and from an objective consideration of what the police officers did or did not do.

The bottom line is that the plaintiff's loss of liberty was minimal, the plaintiff was not charged with a crime, the plaintiff has ignored the obvious fact that he was soliciting which he had reason to know was in violation of a city ordinance, and thus refused to obey a reasonable police order that he cease his conduct.

---

(internal quotation marks and citation omitted).  Here, the officers made a reasonable assessment in that moment, based on common sense derived from years of patrol duty, that intervention was required to "preserve the public peace."  Hock, 728 A.2d at 947.

Upon reaching this stage of analysis, the Court concludes that the police officers were entitled, given the plaintiff's refusal to leave, to use some force, and they used minimal force, to remove him.  Handcuffing an individual is not necessarily arresting someone and it is certainly not charging anyone with a crime.  The plaintiff's liberty was constrained for a period of time by the police, but this fact alone does not entitle the plaintiff to damages, nor does it deprive the police of qualified immunity.

For the reasons above, the officers are entitled to qualified immunity on Counts I, II, and III.

### D.  Plaintiff's Claim for Declaratory Judgment (Count IV)

Plaintiffs seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that

> [t]he posted ban on solicitation outside Christmas Village, banning soliciting in Christmas Village, is not narrowly tailored to further an important governmental interest, affects more constitutionally protected speech than is necessary to protect that interest, is unconstitutionally vague, has been interpreted to ban all leafletting in a public forum area, and violates the First Amendment.

Second Am. Compl. ¶ 112.  Defendants argue that this claim fails because there is nothing in the record suggesting that there was a ban on solicitation or leafletting at the Christmas Village in 2019.  Mot. at 11.  Moreover, even if there was a solicitation ban, Defendants assert that the record fails to support a showing that Plaintiff was constitutionally injured, or otherwise experienced violations of his First, Fourth, or Fourteenth Amendment rights, as a result of the so-called ban. Id.

As an initial matter, Grant clarified in his supplemental briefing following oral argument that the solicitation ban upon which he seeks a declaratory judgment relates to "[t]he posted ban on solicitation outside Christmas Village, banning soliciting in Christmas Village." See Pl.'s Supp.

Br. 3 (stating that the source of authority under which the alleged ban arises is "Philadelphia Code

Title 15 Parks and Recreation.  The ban on solicitation is mentioned in ¶ 112 of the Second

Amended Complaint. . . .  The ban is on a sign posted outside a public property by the City.").

Viewing the facts in the light most favorable to Grant, on December 21, 2019, there is at

least some evidence in the record that there was a sign outside of Love Park, or the Christmas

Village, banning solicitation.  Specifically, Officer Sauris testified to its existence:

> Q: "On December 2[1], 2019, was there a sign at Christmas Village
> saying no soliciting?"
> A: "Yes."

Sauris Dep. 23:22-24.

However, whether the sign existed or not, the Court must consider *sua sponte* whether the

declaratory judgment claim by Plaintiff is ripe for adjudication and concludes that it is not. [20]

Plaintiff's was temporarily seized for an investigative stop where there was probable cause for

suspected violations of a disorderly conduct statute and a city ordinance regarding solicitation

within eight feet of a vendor. [21]  Whether or not Plaintiff also violated a local park ban on

solicitation is irrelevant to the disposition of this case and the Court sees no reason to "rul[e] on

---

[20]    To the extent that the requested declaratory judgment can be construed as an "as applied" challenge to the ban allegedly being interpreted to include leafletting, the Court dismisses it. Plaintiff has not created a record establishing a consistent pattern of such interpretations.  The isolated anecdotes (including nameless hearsay) and allegations in this case are insufficient as a matter of law for the court to issue a sweeping declaration regarding how the ban is generally interpreted.  Instead, the Court construes the Plaintiff's claim solely as a facial challenge to the constitutionality of the alleged ban.

[21]    Plaintiff points to an excerpt of Sauris' testimony to argue that the ban was a basis for arrest and therefore is at issue in the case.  Resp. at 15.  Even assuming, for sake of argument, that the ban was part of subjective state of mind of Sauris during the incident, it is not relevant. There was both probable cause and reasonable suspicion for the seizure based on the disorderly conduct statute and vendor solicitation ordinance.  "The correct test is whether the police action was reasonable *whatever* the subjective intent motivating the relevant officials." Nieves, 139 S. Ct. at 1725 (emphasis in original) (internal quotation marks and citation omitted).  Whether the park's solicitation ban was violated or not is moot because there was probable cause for the other violations.

federal constitutional matters in advance of the necessity of deciding them." Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 413 (3d Cir. 1992); see also Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring).  Again, the Court sets forth its conclusions in full for completeness and the prospect of a potential appeal.

The Third Circuit has articulated a three-pronged test to analyze the ripeness of declaratory judgment claims, looking to (1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.  See Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647 (3d Cir. 1990).

After weighing the three-pronged ripeness test, and in light of the well-established principle of avoiding unnecessary or premature federal constitutional inquiries, the Court concludes that Plaintiff's claim seeking declaratory judgment is not ripe for adjudication, for the reasons set out below.

### 1.    Adversity of Interest

"Parties' interests are adverse where harm will result if the declaratory judgment is not entered."  Plains All Am. Pipeline L.P. v. Cook, 866 F.3d 534, 541 (3d Cir. 2017) (internal quotation marks and citation omitted).  "[W]hen the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III."  Id.  However, "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007).  In these circumstances, "the party seeking review need not have suffered a completed harm to establish adversity—it suffices that there is a substantial threat of

real harm and that the threat ... remain real and immediate throughout the course of the litigation." Plains, 866 F.3d at 541 (internal quotation marks and citation omitted).

While government action is "typically ripe" when a party "is being forced to choose between complying with a burdensome law and risking serious penalties", the Third Circuit has found that this does not apply when the burden and penalties are insufficient. See id. (finding that the burdens of compliance with the audit provisions of a statute, as well as penalties associated with non-compliance, were not sufficient to create adversity of interest).

Here, there is no substantial, immediate threat of real harm facing Grant resulting from Love Park's solicitation ban. Plaintiff had been coming to the Christmas Village since 2014 and told the officers here that he "never had a problem." Grant Dep. 39:17-20. While Grant testifies that he was seized twice by police at the Christmas Village, Grant concedes that both cases were seizures related to Pennsylvania Statutes and Philadelphia Ordinances, not the Love Park solicitation ban:

> Q: Was that arrest – were you arrested for panhandling? Is that what that was for?
> A: No. I was arrested for failure to disperse and disorderly conduct I think.
> Q: And we're talking 2014; is that right?
> A: Yeah.
> Q: And that's the same thing you were arrested for in this case, right?
> A: I think so.

Grant Dep. 35:11-18. Aside from these incidents where police observed violations of statute and ordinance, Grant acknowledges that police did not interfere with his activities:

> Q: All right. And then that same year, did you keep going back, say, the next week, the rest of the month until Christmas Village closed?
> A: Yes.
> . . .

33

> Q: Since the date of this incident, has any police officer, whether the same one or different ones, given you a hard time at Christmas Village or Love Park?
> A: No.
> Q: And sitting here today, it sounds like you're perfectly comfortable going back to Love Park and doing your thing there when you're back on your feet, right?
> A: Yeah, yeah.

Grant Dep. 55:23-56:15.  Grant has not offered any instance of the threat of police action when his only violation was that of the park's alleged solicitation ban.

Moreover, Grant faces little prospect of real harm because the burden of compliance is minimal.  The alleged ban is only relevant in areas of the Christmas Village that are not already covered by the ordinance prohibiting solicitation within eight feet of a vendor.  Vendors surround much of the path within Love Park when it becomes the Christmas Village.  See Resp. Ex. 9, Ex. 11.

Even though there are fewer vendors in Love Park during the rest of the year, the burden resulting from compliance with this alleged ban remains minimal.  If Plaintiff wishes to express his message, he can do so without violating the ban by putting away the collection basket or moving outside of the park.[22]  Similarly, even if the police did take action against Grant, there is no reason to believe that he would face serious penalties for any violation of the park's ban on solicitation.  The Court simply cannot find genuine adversity of interest here.

## 2. Conclusiveness

---

[22]     Plaintiff contends that employees and city agents at Love Park have misapplied the solicitation ban and ordinance by applying it to leafletting activities, which would not be covered by the ban or ordinance.  Resp. at 15-16 n.2.  Even if true, this allegation is not relevant to the case at hand.  Grant was engaged in solicitation – and arguably disorderly conduct – at the time of arrest and his deposition testimony contains no assertion that police stated an objection to Grant handing out literature.

For a declaratory judgment to satisfy the conclusiveness prong, the Third Circuit analyzes two factors.  First, "the legal status of the parties must be changed or clarified by the declaration." Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1155 (3d Cir. 1995).  Second, the Court must ask "whether further factual development… would facilitate decision or the question is predominantly legal."  Plains, 866 F.3d at 543 (internal quotations and citations omitted).

Here, a declaration would not change the legal status of the parties.  Even if the ban posted at the entrance of the Christmas Village were unconstitutional, Grant's seizure would have nevertheless been constitutionally permissible because the police had both reasonable suspicion and probable cause to arrest him for violation of the disorderly conduct statute and the solicitation ordinance.  See supra Section IV.C.

At most, this judgment could clarify where Grant could solicit peacefully in the future inside Love Park.  But even if this prong might slightly favor Plaintiff, it is not sufficient to outweigh the lack of adversity and utility.  Nor does it warrant reaching a federal constitutional question that would not affect the outcome of the case at hand.

### 3.    Practical Utility

Practical utility "goes to whether the parties' plans of action are likely to be affected by a declaratory judgment . . . and considers the hardship to the parties of withholding judgment." Plains, 866 F.3d at 543. (internal quotation marks and citation omitted).  As discussed in the adversity of interest analysis, the hardship of withholding judgment to both parties would be minimal.  See supra Section IV.D.1.  It is also unclear that the parties' plans of action would be likely to change if a declaration was made here.  Plaintiffs have not established any pattern of regular police enforcement of this alleged ban and its existence has never deterred Grant from using a solicitation basket.  See id.  So it would be speculative to suggest that Plaintiff or

Defendants' behavior would change if the Court held that the ban was unconstitutional.  As such, the practical utility of any declaratory judgment is limited at best.

### E.  Plaintiff's Municipal Liability Claim (Count V)

Defendants seek summary judgment as to Plaintiff's municipal liability claim brought pursuant to 42 U.S.C. § 1983 on the theory that

> [t]he City of Phila[delphia] has developed a custom of its police and employees violating the rights of those expressing ideas or leafletting in public forum areas by telling them they could not do so or not to return to do so and/or they could not do so since soliciting was banned, threatening them with arrest if they continued to do so, arresting them for disorderly conduct, failure to disperse, obstructing public passage, or other crimes, with charges dismissed, not taking action though these violations were known and tolerating them.

See Second Am. Compl. ¶ 122.  According to Defendants, Plaintiff's claim lacks evidentiary support in the record, and Grant has failed to prove that the City is the cause of any injury that he suffered.  See Mot. at 12-15.  Grant counters that the City has failed to provide adequate training, or otherwise update its training, on how police should respond to Constitutional violations or solicitations bans, despite having notice that its training was inadequate particularly as to the First Amendment.  Resp. at 22-25.  Grant also argues that the City has no formalized tracking of complaints or violations, or data concerning alleged police interference with free speech or other activity protected under the First Amendment.  Id.

Pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation[,] or decision officially adopted by the governing body or informally adopted by custom."  Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996)).

"Thus, to establish municipal liability under § 1983, [a plaintiff] must show that they were deprived of rights, privileges, or immunities secured by the Constitution and laws, and that the deprivation of those rights was the result of an official government policy or custom."  Id. at 238 (internal quotations and citation omitted).

However, without an underlying constitutional violation, there can be no Monell claim.  Id. at 238 n.15 ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim."); Jefferson v. Lias, 21 F.4th 74, 87 (3d Cir. 2021) (same);  see also Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (neither Monell . . .  nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm.  If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

Because no reasonable jury could conclude that Grant suffered a constitutional violation, Grant's Monell claim fails as a matter of law.[23]

---

[23]     Even if Plaintiff had suffered a constitutional violation, "a municipality cannot be held liable under § 1983 on a respondeat superior theory" purely because it "employs a tortfeasor." Porter v. City of Philadelphia, 975 F.3d 374, 383 (3d Cir. 2020).  Even if that Plaintiff's argument can be construed as an "as-applied challenge" based on viewpoint discrimination and alleged "anti-Christian bias" (See Resp. at 1), the officer's alleged discriminatory implementation of city policy does not give rise to municipal liability based on respondeat superior.

**V.     Conclusion**

For the foregoing reasons, Defendants' Motion is granted.[24]  An appropriate order

follows.

O:\CIVIL 20\20-735 Grant v. City of Phila et al\20cv735 Memo re Summary Judgment.docx

---

[24]     The Court also denies as moot Defendants' Motion to Preclude the Expert Report of Mickie W. McComb (ECF 113).   Even if the Court considered the materials related to these motions, they would not alter the analysis above.